AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched)*
THE 2019 DARK BLUE CHEVROLET EQUINOX BEARING VIN 3GNAXUEVXKL319026 WITH NO LICENSE PLATE CURRENTLY IN LAW ENFORCEMENT CUSTODY

)
)
)
)
)
)
)

Case No. **1:21-MJ-00236**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference).

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) | Hobbs Act Robbery |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

See Attached Affidavit (incorporated by reference).

☑ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

DEREK GRAHAM
Digitally signed by DERE GRAHAM
Date: 2021.03.22 11:07:2 -04'00'

*Applicant's signature*

Derek Graham, ATF Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____FaceTime Video Conference_____ *(specify reliable electronic means)*.

Date: **Mar 22, 2021**

*Stephanie K. Bowman*

*Judge's signature*

City and state: Cincinnati, Ohio

Hon. Stephanie K. Bowman, U.S. Magistrate Judge

*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is the dark blue Chevrolet Equinox with no license plate bearing VIN 3GNAXUEVXKL319026 that is currently in law enforcement custody, pictured below (the "**Vehicle**").

This warrant authorizes the forensic examination of the **Vehicle**'s infotainment and telematics systems for the purpose of identifying the electronically stored information described in Attachment B.

 





2

## ATTACHMENT B

*Property to be seized*

1.      All electronically stored information, on the **Vehicle**'s infotainment and telematics systems described in Attachment A, that relates to violations of 18 U.S.C. §§ 1951(a) (Hobbs Act Robbery) and 371 (Conspiracy) by LAMOND JOHNSON and other unknown individuals on or about February 8 and 9, 2021 (the "Target Offenses"), specifically:

   a.  Any and all electronic data, records, and communications relating to the location of the **Vehicle** at times relevant to the Target Offenses, including but not limited to GPS coordinates;

   b.  Any and all records and information relating to the Target Offenses, including but not limited to records relating to communications between LAMOND JOHNSON and any coconspirators;

   c.  Any and all records and information relating to firearms or ammunition;

   d.  Stored electronic data, information, images, and related digital storage, and/or vehicle diagnostic data from electronic systems within the **Vehicle** that relate to the Target Offenses, including, but not limited to:

      i.   unique device identifiers;

      ii.  media files;

      iii. call logs;

      iv.  contacts;

     v.  SMS;

    vi.  Bluetooth connections;

   vii.  USB connections;

  viii.  voice commands;

    ix.  voice recordings;

    x.  voice calling;

   xi.  web browser history;

  xii.  Wi-Fi connections;

 xiii.  speech recognition;

 xiv.  time updates;

  xv.  track logs;

 xvi.  traction events;

 xvii.  traffic updates;

xviii.  stop/start log;

 xix.  GPS warnings;

  xx.  hard acceleration;

 xxi.  hard braking;

 xxii.  light status;

xxiii.  odometer reading;

xxiv.  gear shifts;

 xxv.  historical navigation data;

xxvi.  historical speed data;

xxvii.  historical event data; and

xxviii.   data streaming services and related content.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: THE 2019 DARK BLUE CHEVROLET EQUINOX BEARING VIN 3GNAXUEVXKL319026 WITH NO LICENSE PLATE CURRENTLY IN LAW ENFORCEMENT CUSTODY | Case No. **1:21-MJ-00236** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Derek Graham, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the search for and seizure of electronically stored information, as particularly described in Attachment B, within the dark blue 2019 Chevrolet Equinox bearing VIN 3GNAXUEVXKL319026 (the "**Vehicle**"), a description of which is contained in Attachment A.

2.       I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), and have been so employed since October of 2007.  As a part of my training with the ATF, I graduated from the Federal Law Enforcement Training Center, Criminal Investigator School, located in Brunswick, Georgia.  I graduated from the ATF Special Agent Basic Training Academy, located in Brunswick, Georgia, in April 2008.  Prior to my employment with ATF, I was a Federal Air Marshal in the Department of Homeland Security

from June 2006 through October 2007.  In addition, I was a Criminal Research Specialist with the Washington, DC High Intensity Drug Trafficking Area/Drug Enforcement Administration from June 2003 through June 2006.  I am a graduate of Augustana College, where I received a Bachelor's degree in Business Administration in May of 2002.  I am also a graduate of Boston University, where I received a master's degree in Criminal Justice in June of 2006.

   3.  I have experience in the investigation, apprehension, and prosecution of individuals suspected of being involved in federal firearms and drug offenses.  I have specific experience in investigating the use of cell phones by criminal suspects who are involved in the commission of those offenses.  I also have knowledge of the technology used by law enforcement authorities to identify cell phones' users and geographic locations.  I have applied for, obtained, and analyzed, or assisted other federal Special Agents and local police officers with applying for, obtaining, and analyzing, more than 360 sets of historical call detail records. In addition, I have mapped in excess of 200 sets of historical records related to telephone cell site information, ping order locations, and/or GPS records.  I have been trained by ATF as a Digital Media Collection Specialist (DMCS), and have completed more than 285 forensic extractions of cellular telephones, computers, and other electronic storage media.  I have also reviewed forensic extractions of cellular telephones, computers, and other electronic storage media, and have examined content and communications contained within these devices obtained by forensic extraction.  This content includes records of communication through call logs, text message content, images and videos, and communication made through various social media applications.

2

I have also conferred with other experienced agents who have reviewed forensic extractions of vehicles' "infotainment" systems, such as the system from which I seek to seize electronically information via the requested warrant.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1951(a) (Hobbs Act Robbery) and 371 (Conspiracy) have been committed by LAMOND JOHNSON and another unidentified individual. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

**PROBABLE CAUSE**

**A.      Introduction**

6.      Over the course of two days, from February 8 to 9, 2021, five gas stations or convenience stores in Hamilton, Mason, Madeira, Blue Ash, and Lebanon, Ohio (all within the Southern District of Ohio) were robbed.  In one of the robberies, the suspect shot the owner of the gas station, who later died from his injuries.

3

7.      As I explain in more detail below, based on the investigation to date, I believe that the same suspect, LAMOND JOHNSON, was involved in each of the robberies and that he had a coconspirator who may have entered at least one of the stores.

8.      I am seeking this warrant for the infotainment and telematics system from a vehicle that, for the reasons below, I believed was used by JOHNSON (the **"Vehicle"**).

**B.      On February 8, 2021, at around 7:48 pm, a Shell gas station in Mason was robbed by a suspect carrying a firearm.**

9.      On February 8, 2021, at approximately 7:48 pm, the Warren County Sheriff's Office received a report of a robbery at the Shell Gas Station at 9791 Mason Montgomery Road in Mason, OH.  Shell Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

10.     Surveillance video from that evening, which includes audio, shows that two Shell Gas Station employees, Victim 1 and Victim 2, were working behind the counter in the area of the cash registers when a suspect who appears to be a Black male entered the gas station.  The suspect was wearing a black hooded sweatshirt that read "Nike" in white lettering, with a white Nike "swoosh" logo.  The sweatshirt's hood was over his head.  The suspect was also wearing black pants with a white logo on the left pant leg, black gloves, black shoes with a small bit of white on the top, and a red face mask or bandana with white accents, as shown in the screenshot below.



11.     After entering, the unidentified suspect walked around the counter to the employee area, where Victim 1 and Victim 2 were standing.  The unidentified suspect then demanded that Victim 1 and Victim 2 open the cash register and place the currency from the cash registers in a bag.  Victim 1 and Victim 2 each opened their respective cash registers and placed the currency from their cash registers into separate plastic bags.  The unidentified suspect then took the bags and left.  As the suspect left, Victim 1 and Victim 2 raised their hands in a gesture that, based on my training and experience, I believe they intended to mean "Do not shoot."

12.     Surveillance video shows that, after leaving the gas station, the unidentified suspect ran west.

5

13.     Surveillance video from a nearby BP gas station, which is located south of the Shell station, shows that, at approximately the same time as the robbery, a person ran from the Shell station over to Monro Auto Service, which is west of the Shell station, and got into a large, white SUV as a passenger. The SUV drove away. Based on this video, I believe that the suspect had a coconspirator who was driving the getaway vehicle.

14.     In an interview, Victim 1 and Victim 2 both said that they had seen a firearm.

15.     The screenshot below shows a map of 9791 Mason Montgomery Road, Monro Auto Service, the BP station, and surrounding areas:



**C. Less than an hour later, a Shell gas station in Hamilton was robbed by an armed suspect matching the same description.**

16.    Less than an hour later, at approximately 8:34 pm on February 8, the Hamilton

Police Department received a report of a robbery at the Shell Gas Station at 2693 Dixie Highway

in Hamilton, OH.  This Shell gas station is approximately 17 miles from the Shell station

described in the preceding section; a search for directions on Google Maps shows that driving

from one to the other would take approximately 28 to 35 minutes, depending on the route.

17.    Shell Gas Station is engaged in the sale of alcohol and/or other items that, based

on my training and experience, I know have affected interstate commerce.

18.    Surveillance video from that evening shows a suspect matching the description of

the suspect in the earlier robbery entering the gas station. Specifically, the surveillance video

shows an individual who appears to be a Black male and who appears to be wearing the same

outfit as the suspect from the Mason incident: a black hooded sweatshirt reading "Nike" and with

the "swoosh" logo (and with the hood up), black gloves, black shoes with a tiny bit of white on

top, and a red face mask or bandana with white accents pulled across his face.  The suspect

appears to be holding a firearm in his right hand, as shown below:

7



19.     Surveillance video shows that the unidentified suspect walked behind the counter, while holding the suspected firearm in his right hand, to where a Shell Gas Station employee (Victim 3) was standing.  The unidentified suspect then directed Victim 3 to put the currency from the cash register into a bag.  Victim 3 complied, and the unidentified suspect then took the bag and left.

20.     The screenshot below shows a map of the relevant Shell gas station in Hamilton and surrounding areas:

8



> **D.** **The next day, at approximately 7:39 pm, Victim 4 was shot and killed during an attempted robbery at Madeira Beverage.**

21.     The next day, on February 9, 2021, at approximately 7:39 pm, Madeira Police

Department received a report of an attempted robbery in which a person had been shot. The

attempted robbery occurred at Madeira Beverage, a convenience store, located at 6005 Kenwood

Road, Madeira, OH. Madeira Beverage is engaged in the sale of alcohol and/or other items that,

based on my training and experience, I know have affected interstate commerce.

22.     The shooting victim (Victim 4) was the owner of Madeira Beverage and had been

working in Madeira Beverage that evening. Victim 4 succumbed to his gunshot-related injuries

later that same night.

23.     That same night, MPD Officers and participating officers located an expended .25 caliber cartridge casing suspected to be ejected from the firearm during the shooting of Victim 4.

24.     Surveillance video from that evening shows that an unidentified suspect, who appears to be a Black male, entered the store wearing a black hooded sweatshirt. The sweatshirt had an unidentifiable white logo or text in the upper left chest area. The suspect was also wearing a red face mask or bandana on his face.



25.     The unidentified suspect entered the store and appeared to look down multiple aisles as he walked through the store. The unidentified suspect then confronted Victim 4, at which time Victim 4 and the unidentified suspect appeared to push and wrestle with each other

10

for approximately four seconds. Victim 4 then raised his hands as the unidentified suspect displayed and pointed a firearm at Victim 4, as shown in the image below:



26. Surveillance footage shows that Victim 4 then appeared to wave the unidentified suspect away. Victim 4 then stepped backwards and turned while holding his abdomen. The unidentified suspect then exited Madeira Beverage.

27. External surveillance cameras show the unidentified suspect running from the building in a southern direction.

28. The screenshot below is a map of 6005 Kenwood Road, where Madeira Beverage is located, and surrounding areas.

11



**E.      Less than 15 minutes later, a Sunoco gas station in Blue Ash was robbed at gunpoint.**

29.      Less than 15 minutes later, at approximately 7:50 pm on February 9, Blue Ash Police Department received a report of a robbery at the Sunoco Gas Station at 10410 Kenwood Road in Blue Ash, OH.  This Sonoco is approximately five miles from Madeira Beverage, both of which are on Kenwood Road.

30.      Sunoco Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

12



31.     Surveillance video of this incident is not currently available for review.

32.     I have reviewed a statement written out by a law enforcement officer who interviewed an employee working at the Sonoco gas station that night (Victim 5). The statement indicates that the police officer "wrote out [the] statement" for Victim 5 "due to language barrier." Victim 5 said that the suspect was a Black man wearing a red jacket and a black face mask. Victim 5 said that he/she "saw a small black gun." Victim 5 said that the suspect aimed the firearm at Victim 5 and said "open the register & take a plastic bag & put in the money." Victim 5 said that he/she and the suspect then put money in the bag and that the suspect then took the bag and ran out towards Kenwood, around the building.

13

33.     Although Victim 5's description of the unidentified suspect differs from the description of the suspect observed in surveillance video described above, I believe that the same suspect, and/or his coconspirator, was likely involved in this robbery due to the geographic and temporal proximity to the other robberies described in this affidavit.

34.     As I described above, surveillance video relating to the incident at the Shell station in Mason suggests that, after the robbery, the suspect got into a white SUV as the passenger. Similarly, as I describe below, a witness to the fifth robbery, in Lebanon, saw the suspect run from the store and get into a vehicle as a passenger. Based on these facts, I believe that the robber was not acting alone.

**F.      About 90 minutes later, a suspect in a black hoodie and a red mask attempted to rob a Marathon gas station in Lebanon at gunpoint.**

35.     Later the same night, at approximately 9:19 pm, Lebanon Police Department (LPD) received a report of an attempted robbery at the Marathon Gas Station located at 660 North Broadway Street, Lebanon, OH. This Marathon is approximately 18 miles away from the Sonoco described in the preceding section; a search on Google Maps suggests that a direct trip between the two would take approximately 25 minutes.

36.     Marathon Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

37.     Based on reports I have reviewed, I understand that the surveillance cameras in the Marathon gas station were not operational at the time of the incident.

14

38.     An employee of the Marathon Gas Station, Victim 6, said that a Black male entered the store wearing a black sweatshirt and with a red mask on his face with white accents on the fabric.

39.     Victim 6 said the unidentified suspect entered the store, removed a soda pop from the cooler, and approached the counter.  Victim 6 stated he/she told the suspect how much the soda pop cost, at which the time suspect pointed a firearm at Victim 6 and staid, "Give me what you got."  Victim 6 said he/she did not comply with the suspect's demand and instead leaned down and grabbed under the counter, pretending he/she had a firearm.  Victim 6 said the unidentified subject then ran from the Marathon Gas Station.

40.     Victim 6 said he/she saw what he/she believed to be a black or dark-blue Chevy Equinox, with its headlights off, pick up the unidentified subject and travel south on North Broadway.  Victim 6 described the driver as a Black male wearing a mask of an unknown color.

41.     Victim 6 said he/she attempted to follow the vehicle as it drove south on North Broadway.  In addition, traffic cameras in the city of Lebanon captured a suspected Chevrolet Equinox driving with its headlights off as it continued south on North Broadway and then turned left on Main Street, driving east.

42.     The screenshot below is a map of the location of the Marathon gas station and surrounding areas:



**G.** **Based on the investigation to date, I believe that the same two suspects likely committed all five of the robberies described above.**

43.      Because of the geographic and temporal proximity of all five of the robberies; because surveillance video shows a similar suspect in a black hooded sweatshirt and with a red face covering in the first, second, third, and fifth robbery; and because surveillance video or Victim statements from some of the robberies suggest that the suspect entered a getaway vehicle as a passenger, I believe that the same suspect and a coconspirator are involved in all of the robberies described above.

16

**H.** **Information from Google suggests that an electronic device associated with LAMOND JOHNSON was present at at least four of the robberies.**

44.     Based on my training and experience, as well as open-source materials published by Google LLC ("Google"), I know that Google offers accountholders a service called "Location History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain a record of the locations where Google calculated a device to be based on information transmitted to Google by the device. That Location History is stored on Google servers, and it is associated with the Google account that is associated with the device. Each accountholder may view their Location History and may delete all or part of it at any time.

45.     Based on my training and experience, I know that the location information collected by Google and stored within an account's Location History is derived from sources including GPS data and information about the wi-fi access points and Bluetooth beacons within range of the device.  Google uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data.  Google records the margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a "maps display radius," for each latitude and longitude point.

46.     On February 12, 2021, the Honorable Judge Litkovitz, U.S. Magistrate Judge for the Southern District of Ohio, issued Search Warrant No. 1:21-MJ-0158, directing Google to provide information and records relating to any Google accounts that were present in at particular locations and particular times associated with the robberies described above, specifically:

17

Incident 1: Shell Gas Station - 9791 Mason-Montgomery Road, Mason, OH

- Date: February 8, 2021
- Time Period: 7:40pm – 7:55pm EST (Eastern Standard Time), UTC -5 Hours
- Target Location:  Area contained within below listed points
    1. Point A: 39.296221, -84.317776
    2. Point B: 39.296090, -84.315510
    3. Point C: 39.295320, -84.315633
    4. Point D: 39.295428, -84.317975



Incident 2: Shell Gas Station - 2693 Dixie Highway, Hamilton, OH

- Date: February 8, 2021
- Time Period:  8:25pm – 8:40pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location:   Geographical area contained within the below listed points
    o Point A: 39.369753, -84.548786
    o Point B: 39.369605, -84.547314
    o Point C: 39.368719, -84.546825
    o Point D: 39.368824, -84.548856



Incident 3: Madeira Beverage - 6005 Kenwood Road, Madeira, OH

- Date: February 9, 2021
- Time Period: 7:30pm – 7:45pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location: Geographical area contained within the below listed points
  - Point A: 39.175858, -84.384784
  - Point B: 39.176247, -84.383480
  - Point C: 39.175407, -84.383912
  - Point D: 39.175346, -84.385028



19

Incident 4: Sunoco Gas Station – 10410 Kenwood Road, Blue Ash, OH

- Date: February 9, 2021
- Time Period:  7:45pm – 8:00pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location:   Geographical area contained within the below listed points
  - Point A: 39.252955, -84.375301
  - Point B: 39.252697, -84.373943
  - Point C: 39.250004, -84.374299
  - Point D: 39.250736, -84.375569



Incident 5: Marathon Gas Station – 660 North Broadway Street, Lebanon, OH

- Date: February 9, 2021
- Time Period:  9:10pm – 9:25pm EST (Eastern Standard Time) UTC -5 Hours

20

- Target Location:  Geographical area contained within the below listed points
  - Point A: 39.446145, -84.206722
  - Point B: 39.446348, -84.203562
  - Point C: 39.443448, -84.204002
  - Point D: 39.439320, -84.207115
  - Point E: 39.433806, -84.207528
  - Point F: 39.433347, -84.203492
  - Point G: 39.432357, -84.203525
  - Point H: 39.432789, -84.209243



47.     On March 1, 2021, Google provided Anonymized Device Identification (ID) information for Google accounts present at the described locations and time ranges. I conducted an analysis of the Anonymized Device ID information and identified three Anonymized Device IDs—ID numbers -967784745, 469003545, 290681031—that, according to Google's data, were present at all of the following locations during the time periods listed above:

- February 8, 2021 – Shell Gas 9791 Mason-Montgomery Rd., Mason, OH

- February 8, 2021 – Shell Gas 2693 Dixie Hwy, Hamilton, OH

- February 9, 2021 – Sunoco Gas 10410 Kenwood Rd., Blue Ash, OH

- February 9, 2021 – Marathon Gas 660 N. Broadway St., Lebanon, OH

48.     I requested that Google provide identifying information for those three IDs, and on March 5, 2021, Google provided information showing that the Anonymized Device IDs are associated with the following Google Account IDs:

- Anonymized Device ID -96778475  = Google Account ID 369781974448

- Anonymized Device ID 469003548 = Google Account ID 583241281066

- Anonymized Device ID 290681031 = Google Account ID 849998195587

49.     The records from Google showed that Google Account ID 369781974448 is associated with the following subscriber:

   a.   Name: LAMOND JOHNSON

   b.   Email: johnsonlamond33@gmail.com

   c.   Recovery Email: johnsonlamond3@gmail.com

d. Recovery SMS: 513-280-1364

50. Google Account ID 583241281066 is associated with the following subscriber:

a. Name: Salvatore Ferragamo

b. Email: johnsonlamond3@gmail.com

c. Recovery Email: johnsonlamond33@gmail.com

d. Recovery SMS: 513-280-1364

51. Google Account ID 849998195587 is associated with the following subscriber:

a. Name: LAMOND JOHNSON

b. Email: johnsonlamond86@gmail.com

c. Recovery Email: None Listed

52. Because all three of these accounts are associated with the name "Lamond Johnson" either in the subscriber name or in the email address (all three of which are variations on "johnsonlamond"), I believe that all three of these accounts are used by the same person. Moreover, because 513-280-1364 is the "Recovery SMS" phone number for two of the three accounts, I believe the user of these accounts likely uses the phone number 513-280-1364. Based on my training and experience, I know that a "Recovery SMS" phone number is the phone number to which Google sends a text message if the user forgets the password to his or her account.

53. On March 5, 2021, I queried telephone number 513-280-1364 through a database accessible by law enforcement that I have determined in the past to be accurate and credible.

23

Based on this query, I identified telephone number 513-280-1364 to be associated with

LAMOND JOHNSON (which is consistent with the subscriber names and email addresses

described above).

> **J.    On March 7, 2021, location data for 513-280-1364 put the phone near 2723 Baker Avenue, Cincinnati, OH; an agent saw JOHNSON come out of 2723 Baker Avenue, get into the Vehicle, and drive away.**

54.    On March 5, 2021, the Honorable Judge Stephanie K. Bowman, U.S. Magistrate

Judge for the Southern District of Ohio, issued search warrant No. 21-MJ-0194, which directed

Verizon, the service provider for 513-280-1364, to provide intermittent GPS location

information for the device with phone number 513-280-1364.

55.    On March 5, 2021, Verizon began providing GPS location information for phone

number 513-280-1364.

56.    When agents first began receiving GPS location data for 513-280-1364, the data

showed that the device was in Michigan. However, on March 6, 2021, the device began traveling

south toward Cincinnati.

57.    From approximately 1:22 a.m. through approximately 12:36 p.m. on March 7,

2021, Verizon provided GPS location data approximately every 15 minutes showing that the

device was in the approximate area of Harrison Avenue and Baker Avenue in Cincinnati. The

intersection of Harrison and Baker is approximately one-tenth of a mile from 2723 Baker

Avenue, Cincinnati, OH.

58.     When agents established surveillance in the area of Harrison Avenue and Baker Avenue on March 7, 2021, ATF SA Remick-Cook saw a dark-blue Chevrolet Equinox bearing Florida license plate CTKZ29 (the **Vehicle**) parked in the parking lot of an apartment complex located at 2723 Baker Avenue, Cincinnati, OH. The license plate showed that the vehicle was serviced and maintained by the car rental agency Hertz.

59.     The **Vehicle** was of particular interest to SA Remick-Cook because the vehicle matched the description of the robber's vehicle as provided by the victim from the robbery in Lebanon, as well as the description of a vehicle captured on a traffic camera near the Lebanon robbery at the relevant time; that vehicle was driving with no headlights on at night time, and it also ran a red light.

60.     Cincinnati Police Officer Hoffbauer contacted Hertz about the **Vehicle**. Hertz provided information showing that the **Vehicle** had been rented in the name of LAMOND JOHNSON on February 9, 2021 (the night of the second set of robberies described above).

61.     Also on March 7, 2021, SA Remick-Cook saw an individual exit the apartment building at 2723 Baker Avenue and enter the **Vehicle**. The individual then got back out of the **Vehicle** and reentered 2723 Baker Avenue.

62.     Shortly thereafter, SA Remick-Cook saw the same individual come back out of 2723 Baker Avenue and approach the **Vehicle** again. This time, SA Remick-Cook was able to identify the person as LAMOND JOHNSON, based on SA Remick-Cook's prior review of

25

photos of JOHNSON from law enforcement databases. SA Remick-Cook watched as JOHNSON

removed the license plate from the **Vehicle** and then reentered 2723 Baker Avenue.

63.     Shortly after that, JOHNSON exited 2723 Baker Avenue again, entered the

**Vehicle**, and drove away.

64.     Officers and agents followed the **Vehicle** as it drove eastbound on Harrison

Avenue toward Queen City Avenue. Officers and agents then saw the **Vehicle** at the BP Gas

Station at the intersection of Harrison Avenue and Queen City Avenue. At approximately the

same time, GPS information for 513-280-1364 showed that the device was also in that

approximate area. As surveillance continued, sightings of JOHNSON corresponded with GPS

location information for 513-280-1364 on several more occasions, which I believe shows that

JOHNSON had the device with phone number 513-280-1364 on his person.

**L.      On March 7, 2021, JOHNSON was pulled over in the Vehicle, and he
         attempted to flee**.

65.     On March 7, 2021, agents and officers attempted to stop JOHNSON in the

**Vehicle.**  JOHNSON and one passenger from the vehicle both attempted to flee. Another

passenger stayed in the vehicle.

66.     After the other passenger was removed from the **Vehicle**, agents saw a cell phone

in the vehicle's center console.

26

**M.     On March 7, 2021, the Vehicle was searched pursuant to a search warrant.**

67.     On March 7, 2021, the Honorable Judge Stephanie K. Bowman, U.S. Magistrate Judge for the Southern District of Ohio, issued Search Warrant No. 1:21-MJ-0197, authorizing the search of the **Vehicle**.

68.     Currently, the vehicle is located in the basement of the federal building located at 550 Main Street, Cincinnati, OH.  The vehicle was transferred to this location after the execution of the aforementioned search warrant on March 7, 2021.  While ATF might already have all necessary authority to examine the infotainment and telematics systems pursuant to the previously executed warrant, I seek this additional warrant out of an abundance of caution.

**N.     The Vehicle contains a telematics and infotainment system that is capable of storing electronic information such as GPS data.**

69.     I know from publicly available information from Chevrolet that Chevrolet offers a telematics and infotainment system on its 2019 Chevrolet Equinox models. These systems are designed to store a vast amount of data, which includes recent destinations, favorite locations, call logs, contact lists, SMS messages, emails, pictures, videos, social media feeds, and the navigation history of everywhere the vehicle has travelled.  These systems may also record events such as the activation or deactivation of the vehicle's headlights, the opening and closing of doors at a specific location, and the location of the vehicle at the time Bluetooth-enabled devices are connected.

70.     The **Vehicle** is a 2019 Chevrolet Equinox, and it is equipped with infotainment and telematics systems in the center console/dashboard.  As described in detail below, based on

27

my training and experience and publicly available information about the infotainment and telematics systems, I believe that electronic data, information, and images stored on these systems may be successfully extracted from the **Vehicle** by using proprietary hardware and software.

71.     As described above, based on information from Hertz, I know that the **Vehicle** was rented under the name LAMOND JOHNSON on or about February 9, 2021, and JOHNSON was arrested while driving the **Vehicle** on March 7, 2021.

72.     On March 7, 2021, SA Remick-Cook, during surveillance of LAMOND JOHNSON and the **Vehicle** at 2723 Baker Avenue, Cincinnati, OH, heard a ringtone and then a female's voice emanating from the vehicle speakers of the **Vehicle**. Based on my investigation and my knowledge that infotainment systems commonly permit users to wirelessly answer phone calls placed to a Bluetooth-connected cell phone and to hear those phone calls through the car's speakers (as I describe in more detail below), I believe that SA Remick-Cook's observations show that LAMOND JOHNSON used the **Vehicle**'s infotainment system while using the **Vehicle**.

73.     I also know, based on my training and experience, that electronic information can be stored and recovered long after the information was originally uploaded or recorded, similar to other electronic devices such as computers and cell phones.  Even if a user deletes electronically stored data, forensic examiners may still be able to access and retrieve data using advanced forensic techniques.  For these reasons, I believe the **Vehicle**'s infotainment and

28

telematics system likely contains relevant electronic data that forensic examiners will be able to retrieve.

## TECHNICAL BACKGROUND REGARDING THE VEHICLE AND ITS INFOTAINMENT AND TELEMATICS SYSTEMS

74. Based on my training and experience, as well as discussions with other experienced law enforcement officers and witnesses, I have learned that:

    a. Many modern motor vehicles are equipped with sensors, cameras,[1] transmitters, and electronic control units (ECUs)[2] to monitor and manage vehicle operations, track vehicle movement, and exchange information with other vehicles and infrastructure.[3] These systems also enable motor vehicles to interface with various

---

[1] As of 2018, the US National Highway Safety Transportation Agency requires new motor vehicles sold in the United States to have backup cameras installed by the manufacturer.

[2] "ECU" is a generic term applied to any embedded computer that controls one or more electrical systems within a vehicle. ECUs are typically installed in a vehicle by the original equipment manufacturer during the manufacturing process. There are many types of ECUs, and as vehicles have more features each year, the number of ECUs in each motor vehicle increases. Newer motor vehicles can integrate as many as 150 ECUs, ensuring, in theory, that each part of the motor vehicle is running properly. Some examples of common ECUs include the Engine Control Module, Transmission Control Module, Brake Control Module, and Suspension Control Module, as well as the Telematics Control Unit and Infotainment Control Unit.

[3] The infotainment and telematics systems in motor vehicles are not the same as "black box" recorders. Black box recorders are called event data recorders (EDRs) or crash data recorders. These black box recorders can record vehicle speed, engine speed, steering angle, throttle position, braking status, force of impact, seatbelt status, and airbag deployment. In 2006,

types of mobile devices to facilitate the use of applications, including third-party

navigation, wireless telephone, multimedia streaming, and the like. To perform

these computing functions, modern motor vehicles collect, process, and store

significant volumes of data.

b. Two commonly installed ECUs within motor vehicles are infotainment and

telematics systems—sometimes referred to as the Telematics Control Unit and the

Infotainment Control Unit. These systems typically retain large amounts of user

data within the vehicle.

c. A vehicle's infotainment system combines hardware and software to provide

entertainment features. Many infotainment systems allow drivers and passengers

to connect their handheld electronic devices to the vehicle. When connected, the

driver and/or passengers may gain access to, for example, Global Positioning

System (GPS) navigation, video players, music streaming, voice calling, texting,

and traffic data. Many systems enable talking hands-free with Bluetooth

connectivity, listening to music, watching videos, or pulling up a mapped route to

---

the US National Highway Traffic Safety Administration (NHTSA) adopted regulations requiring
EDRs to uniformly collect certain crash data to assist crash investigators with accident
reconstruction efforts. In 2012, NHTSA proposed requiring manufacturers to install EDRs in all
new cars and trucks, but in 2019, the NHTSA withdrew the proposal because automakers have
voluntarily installed the devices in nearly all vehicles.

a destination. Many of these features are accessible via the (usually interactive) console located on the front dashboard of the vehicle.

d. A vehicle's telematics system typically collects and stores diagnostic data from various systems (other ECUs) within the vehicle, including historical navigation points, speed, and event data. Historical event data may include information regarding when the car's trunk, doors, and windows opened and closed, when headlights turned on and off, and when gears changed or brakes were engaged.

e. The main difference between the infotainment and telematics systems is that the infotainment system is about entertainment for the occupants of the vehicle, and the telematics system is for collecting and reporting (transmitting) information— such as vehicle use data, maintenance requirements, and automotive servicing— about the vehicle. Typical telematics data may include turn-by-turn navigation, remote access, emergency calling, and maintenance notifications. Examples of vehicle telematics systems include General Motors' OnStar, BMW's "Assist," and Mercedes' "mbrace." Some of these systems are integrated multimedia navigation and telematics systems in one (combined infotainment/telematics systems), like Toyota's "Entune" and Ford's "Sync."

f. The data generated, collected, transmitted, and retained by motor vehicles can provide valuable information in law enforcement investigations of crimes. For

31

example, many infotainment systems support the importation of content and other data information from a particular user's mobile device. Such data may include content that may provide attribution to particular user(s), including mobile device identifiers, wireless telephone numbers, user account details, passwords, user voice profiles, contact lists, call logs, text messages, pictures, e-mail, videos, web history, GPS coordinates, and other historical navigation information.

g.  I am aware that the computers (ECUs) within many motor vehicles store data for prolonged periods of time. Furthermore, even after a previously-connected mobile device is removed from the physical vehicle, data may remain within the digital storage of the system. Such stored data can be used to identify locations, victims, witnesses, associates, and co-conspirators and may include communications and images of criminal activity. In sum, a forensic examination of a motor vehicle's infotainment and telematics systems may reveal the vehicle's GPS location information, movements, operations, and user data at critical moments before, during, and after the commission of a crime.

h.  As previously stated, the **Vehicle** is a Chevrolet Equinox.  I believe that, LAMOND JOHNSON used the **Vehicle** to drive to and from the robberies on February 9, 2021, described above, and to additional locations yet unknown.  To complete a forensic extraction from the **Vehicle**, it may be necessary, temporarily,

32

to remove trim and other components of the **Vehicle** to access the information subject to search. It may also be necessary to repair the device, replace the screen, reconnect wires, and replace batteries. It may be necessary to employ advanced forensic processes to bypass locked display screens and other data access restrictions. Advanced processes may include potentially destructive forensic techniques used to remove memory chips from computers and other electronic storage containers that may be found within the **Vehicle**. In the event that potentially destructive processes are required to perform this extraction, parts of the **Vehicle** may be destroyed and rendered useless.

i.  Furthermore, it may be necessary to return to the **Vehicle** and reconnect the infotainment and telematics systems to the **Vehicle**'s power source to perform the extraction using forensic software. This is because there are various computer networks working simultaneously when a vehicle is powered on, and in some vehicles, the infotainment and telematics systems require the other networks to work in tandem to complete the data extraction.

j.  The requested warrant authorizes a later review of the media and information seized or copied from the **Vehicle**, which review may continue past the date required for execution of the warrant.

33

k.  The requested warrant further authorizes ATF to obtain the assistance of outside

agencies and/or outside vendors to complete the above-described extraction of

information from the **Vehicle**.

## **CONCLUSION**

75.  I submit that this affidavit supports probable cause for a warrant authorizing the

extraction and forensic examination of electronically stored information within the **Vehicle**

described in Attachment A and the seizure of the items described in Attachment B.

Respectfully submitted,

DEREK GRAHAM
Digitally signed by DEREK
GRAHAM
Date: 2021.03.22 11:08:35 -04'0

DEREK GRAHAM
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me in accordance with Fed. R. Crim. P. 4.1
on March  22   , 2021.

HON. STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

34

**<u>ATTACHMENT A</u>**

*Property to be searched*

The property to be searched is the dark blue Chevrolet Equinox with no license plate bearing VIN 3GNAXUEVXKL319026 that is currently in law enforcement custody, pictured below (the "**Vehicle**").

This warrant authorizes the forensic examination of the **Vehicle**'s infotainment and telematics systems for the purpose of identifying the electronically stored information described in Attachment B.







**ATTACHMENT B**

*Property to be seized*

1.       All electronically stored information, on the **Vehicle**'s infotainment and telematics systems described in Attachment A, that relates to violations of 18 U.S.C. §§ 1951(a) (Hobbs Act Robbery) and 371 (Conspiracy) by LAMOND JOHNSON and other unknown individuals on or about February 8 and 9, 2021 (the "Target Offenses"), specifically:

   a.   Any and all electronic data, records, and communications relating to the location of the **Vehicle** at times relevant to the Target Offenses, including but not limited to GPS coordinates;

   b.   Any and all records and information relating to the Target Offenses, including but not limited to records relating to communications between LAMOND JOHNSON and any coconspirators;

   c.   Any and all records and information relating to firearms or ammunition;

   d.   Stored electronic data, information, images, and related digital storage, and/or vehicle diagnostic data from electronic systems within the **Vehicle** that relate to the Target Offenses, including, but not limited to:

        i.    unique device identifiers;

        ii.   media files;

        iii.  call logs;

        iv.   contacts;

    v.  SMS;

   vi.  Bluetooth connections;

  vii.  USB connections;

 viii.  voice commands;

   ix.  voice recordings;

    x.  voice calling;

   xi.  web browser history;

  xii.  Wi-Fi connections;

 xiii.  speech recognition;

 xiv.  time updates;

  xv.  track logs;

 xvi.  traction events;

 xvii.  traffic updates;

xviii.  stop/start log;

 xix.  GPS warnings;

  xx.  hard acceleration;

 xxi.  hard braking;

 xxii.  light status;

xxiii.  odometer reading;

xxiv.  gear shifts;

 xxv.  historical navigation data;

xxvi.  historical speed data;

xxvii.  historical event data; and

2

xxviii.   data streaming services and related content.